**In re CALORE EXPRESS COMPANY, INC., Debtor.**

**Bankruptcy No. 95–13291–JNF.**

United States Bankruptcy Court,
D. Massachusetts.

Aug. 21, 1996.

Harold Murphy, Hanify & King, Boston, MA, for Debtor.

Henry Riordan, Charles Cannon and Susan Postwistilo, U.S. Dept. of Justice, Washington, DC, for USA/Internal Revenue Service.

Joel Rosenthal, Shapiro, Israel & Weiner, P.C., Boston, MA, for Fleet National Bank.

### MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matter before the Court is the Motion of the United States of America for Relief from the Automatic Stay to Effect Setoff of Pre- and Postpetition Claims, or, in the Al-ternative, for Adequate Protection (the "Motion to Setoff"). Through the Motion to Setoff, the United States seeks to setoff the postpetition claim of the Internal Revenue Service ("IRS") in the sum of $239,581.83 for FICA and FUTA taxes incurred by the Calore Express Company, Inc. (the "Debtor") during 1995 against monies owed to the Debtor by the General Services Administration ("GSA"). The United States also seeks to setoff prepetition claims against any monies that may be owed to the Debtor by GSA for prepetition services. The Debtor and its major secured creditor, Fleet National Bank, filed objections to the Motion to Setoff. The Court held a hearing on the Motion to Setoff on July 30, 1996. In accordance with Fed. R.Bankr.P. 7052, the Court makes the following findings of fact and conclusions of law.

## II. FACTS

The facts necessary to decide the Motion to Setoff are not in dispute. The Debtor filed a voluntary petition under Chapter 11 on May 11, 1995. It operated its business as a debtor-in-possession until the Court granted its primary lender, Fleet National Bank, the successor by merger of Shawmut Bank (the "Bank"), relief from the automatic stay imposed by 11 U.S.C. § 362 on July 17, 1996.

At the inception of its Chapter 11 case, the Debtor filed, on May 15, 1995, an Emergency Motion for Order Authorizing and Approving Borrowing on a Secured and Super–Priority Basis (the "Borrowing Motion"). Pursuant to the Borrowing Motion, the Debtor sought authority to enter into a financing arrangement with Shawmut Bank, whereby the Debtor, subject to a $3,000,000.00 limitation, would be able to borrow an amount equal to the sum of 80% of outstanding qualified accounts receivable, 20% of prepetition and postpetition receivables actually collected and up to $800,000.00. In the Borrowing Motion, the Debtor acknowledged the validity of the Bank's senior lien, and further agreed to grant the Bank both a superpriority claim over any and all administrative expenses and a security interest in all postpetition assets secured by valid, binding, enforceable and perfected liens in its collateral, including ac-

**426**

counts receivable pursuant to 11 U.S.C. § 364(c)(1), (2) and (d).

On May 17, 1995, after a hearing, the Court entered an interim Order Authorizing Post–Petition Secured and Super–Priority Borrowing. On June 2, 1995, the Debtor filed a Motion for Entry of Final Order approving the Borrowing Motion, which motion was properly served upon the United States. The Court scheduled a further hearing on the Borrowing Motion for June 6, 1995. At the June 6, 1995 hearing, the Court authorized the borrowing, with some revisions to the borrowing order proposed by the parties, but on the essential terms and conditions outlined in the original Borrowing Motion filed on May 17, 1995. In addition, the Court scheduled a further hearing on the Borrowing Motion for June 27, 1995. On June 27, 1995, the Court entered another written order authorizing the borrowing arrangement (collectively the "Borrowing Orders"). Through the Borrowing Orders, in consideration of both the Bank's agreement to make postpetition loans and the agreement regarding the use of cash collateral, the Court granted the Bank a senior lien on all of the Debtor's postpetition assets, a lien to secure any postpetition diminution in value caused by the use of cash collateral, and superpriority claims in this case.

In June and July of 1995, two of the Debtor's equipment lenders, Navistar Financial Corporation and Orix Credit Alliance, Inc., filed motions to convert the Debtor's case to Chapter 7 and motions for relief from the automatic stay to repossess their collateral. As a result, the Court determined to closely monitor the Debtor's borrowings. The Court scheduled periodic hearings on the status of the Debtor's postpetition borrowings from the Bank, as well as the general status of the case. See 11 U.S.C. § 105(d). Thus, on July 18, 1995,[1] August 21, 1995,[2] October 19, 1995, November 21, 1995,[3] January 18, 1996, February 27, 1996, April 3, 1996 and April 26, 1996, the Court held hearings to consider further borrowings by the Debtor and the status of the case.[4]

On November 20, 1995, the IRS filed a "Request for Payment of Internal Revenue Taxes" (the "First Administrative Claim") in which it sought payment of $480,482.52. It asserted that $104,839.39 was attributable to FICA withholding taxes due for the period ending June 30, 1995. The balance represented unassessed, estimated liabilities not yet due for the third and fourth quarters of 1995. The IRS did not file a request for hearing with the First Administrative Claim and did not mention any right of setoff. On December 5, 1995, the IRS filed another "Request for Payment of Internal Revenue Taxes" (the "Second Administrative Claim") in the total sum of $208,850.27 for FICA withholding taxes, interest, and penalties for the periods ending June 30, 1995 and December 31, 1995. The IRS did not request a hearing on the Second Administrative Claim and did not assert any right of setoff in the Second Administrative Claim.

---

**1.** The July 18, 1995 order permitting borrowing to continue was conditioned on the payment of approximately $40,000.00 in unpaid postpetition payroll taxes.

**2.** At the August 21, 1995 hearing, counsel to the Debtor reported that the Debtor had paid the postpetition payroll taxes.

**3.** On October 26, 1995, the Court ordered the Debtor to file by November 10, 1995 a statement of all accrued and unpaid postpetition liabilities owed as of October 21, 1995. On November 13, 1995, the Debtor filed a statement indicating that it owed a total of $105,518.06 in postpetition state and federal taxes for the months of September and October 1995.

**4.** The Court held a total of 26 hearings in this case on the following dates: May 17, 1995, June 6, 1995, June 20, 1995, June 27, 1995, July 12, 1995, July 18, 1995, August 1, 1995, August 21, 1995, September 7, 1995, October 11, 1995, October 17, 1995, October 19, 1995, November 21, 1995, January 9, 1996, January 18, 1996, February 27, 1996, March 7, 1996, March 27, 1996, April 1, 1996, April 3, 1996, April 16, 1996, June 10, 1996, July 2, 1996, June 17, 1996, July 16, 1996 and July 30, 1996. The United States appeared through its attorney at five of the hearings, specifically those held on April 3, 1996, June 10, 1996, June 17, 1996, July 2, 1996 and July 30, 1996. At each of the hearings at which the United States appeared (other than the July 2, 1996 and the July 30, 1996 hearings), it was represented by Attorney Henry J. Riordan ("Attorney Riordan") of the Tax Division, United States Department of Justice, Washington, D.C.

On December 7, 1995, the IRS filed a Proof of Claim for unpaid prepetition taxes in the total sum of $146,609.36 (the "First Proof of Claim"). The IRS claimed that it was owed $13,328.12 as a general unsecured claim and $133,281.24 as a priority unsecured claim. It did not assert that any portion of its claim was secured.

On December 22, 1995, the Debtor filed a Disclosure Statement and Plan of Reorganization. The Court scheduled a hearing on the adequacy of the Debtor's Disclosure Statement for January 18, 1996. Various parties, but not the IRS, filed objections to the Debtor's Disclosure Statement. The IRS did not appear at the hearing on January 18, 1996. The Court ordered the Debtor to file an Amended Disclosure Statement by February 20, 1996 and directed that further objections to the adequacy of the Amended Disclosure Statement were to be filed by February 23, 1996.

On January 25, 1996, the IRS filed another Proof of Claim (the "Second Proof of Claim") in which it indicated that it was owed the total sum of $3,105,612.90 for prepetition taxes. In its Second Proof of Claim, the IRS asserted that $2,448,520.69 was a secured claim, $572,683.35 constituted an unsecured priority claim and $84,408.86 was an unsecured claim. In Paragraph 6 of both the First and the Second Proofs of Claim, entitled "Credits and Setoffs," the IRS made the following representation: "The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor." In an undated attachment to the Second Proof of Claim, described as "Amendment No. 1 to Proof of Claim dated 12/07/95," the IRS further asserted that the bulk of its claim was a secured claim by virtue of notices of tax liens filed in Boston in April and May of 1995, relating to an entity known as C.F.S. Air Cargo, Inc., which the IRS described as an alter ego of the Debtor. In the attachment to the Second Proof of Claim, the IRS represented the following: "This claim is not subject to any setoff or counterclaim." On February 23, 1996, the Debtor filed an objection to the IRS's Second Proof of Claim.

The Debtor filed a Third Amended Disclosure Statement and a Third Amended Plan of Reorganization on March 8, 1996. In its Third Amended Disclosure Statement, the Debtor indicated that it owed $129,243.79 in postpetition taxes to the IRS for the months of November and December 1995.

Due to the magnitude of the IRS claims, which, if allowed, would significantly affect the Debtor's proposed reorganization by virtue of the requirements of the Bankruptcy Code for treatment of the various IRS claims, see 11 U.S.C. § 1129(a)(9)(A) (administrative claims), 11 U.S.C. § 1129(a)(9)(C) (priority tax claims), 11 U.S.C. § 1129(b)(2)(A) (secured claims), the Court concluded that it was necessary to determine the allowed amount of the IRS claims in connection with confirmation of the Debtor's plan. Accordingly, with the consent of the Debtor, the IRS and other interested parties, the Court scheduled an expedited evidentiary hearing with respect to the Debtor's objection to the IRS's Second Proof of Claim for April 26, 1996. On April 3, 1996, the Court issued a pretrial order with respect to the contested matter.

The Court approved the Debtor's Third Amended Disclosure Statement and also scheduled a confirmation hearing for April 3, 1996. Although various interested parties filed objections to the adequacy of the Debtor's Third Amended Disclosure Statement, the United States did not file an objection. However, on April 1, 1996, the United States, on behalf of the IRS, filed an objection to the Debtor's Third Amended Plan in which it stated that the Debtor's plan was not confirmable due to the amount of prepetition and postpetition taxes due to the IRS. In its objection to the plan, the IRS also stated that the "Bankruptcy Code specifically preserves the United States' right to offset any pre-petition claims of the United States against any pre-petition claims of the Debtor." However, in its objection to the plan, the IRS did not specifically assert a right to setoff, or state any facts to support a claim of setoff.

On April 24, 1996, Attorney Riordan and the Debtor's counsel filed a Joint Pretrial Memorandum with respect to the Debtor's

Objection to Prepetition Claim of the IRS. In the Joint Pretrial Memorandum, the parties stipulated that "the creditor United States is the holder of an unsecured priority tax claim in the amount of approximately $1,685,886.74" and that the legal issue for determination by the Court was "[w]hether Calore Express Company, Inc. and C.F.S. Air Cargo, Inc., are the alter egos, nominees, and transferees of each other." In the Joint Pretrial Memorandum, the IRS did not state any facts or mention issues relating to setoff.

On April 24, 1996, the Debtor and the United States also filed a Joint Motion to Continue Trial in Regard to Debtor's Objection to Prepetition Claim of the Internal Revenue Service. In the Joint Motion to Continue, the Debtor conceded that the IRS held an unsecured priority claim in the sum of "approximately $1,685,886.74," indicated that it accepted certain of the liabilities for taxes associated with the employees of C.F.S. Air Cargo, Inc. and admitted that it was unable to service its tax obligations in the context of a plan in accordance with 11 U.S.C. § 1129(a)(9)(C). In the Joint Motion to Continue, the parties did not mention any facts or issues relating to setoff. Additionally, the Debtor stated, in the Joint Motion to Continue, that in light of its inability to propose a confirmable plan, it was withdrawing its plan and proposing a sale of substantially all of its assets pursuant to 11 U.S.C. § 363. The Court granted the Joint Motion to Continue, cancelled the evidentiary hearing on the Debtor's objection to the IRS's claim and cancelled the hearing on confirmation of the Debtor's plan.

On April 26, 1996, the Debtor and the Bank filed a Stipulation pursuant to which they agreed that, pending the Debtor's proposed sale of all assets, the use of cash collateral and the borrowing stipulation previously filed and approved would continue until May 3, 1996 and that extensions "may be agreed to by the parties ... without further order of the Court upon the filing of a notice of same." The Court approved the Stipulation on April 27, 1996. The Debtor and the Bank filed Notices of Extension of the Use of Cash Collateral and Borrowing on May 6, 1996, May 14, 1996, May 20, 1996,

May 29, 1996, June 5, 1996, June 10, 1996, June 19, 1996, July 16, 1996 and July 20, 1996. Despite being properly served, the United States did not object to the Debtor's original Borrowing Motion, any subsequent motion for approval of the borrowing stipulations or any notice of extension of the borrowing stipulations.

On May 31, 1996, the Debtor filed a Motion to Approve the Sale of Debtor's Assets and Assumption and Assignment of Contracts Pursuant to 11 U.S.C. §§ 363(b) and 365 (the "Sale Motion") and a Motion for Entry of Order Approving (1) Competitive Bidding Process, (2) Breakup Fee, and (3) Overbid Protections, and Fixing the Date and Time for Hearing on its Sale Motion (the "Procedural Motion"). The Court scheduled an expedited hearing on the Procedural Motion for June 10, 1996. The Court also scheduled a hearing for the same day on its own motion for the Debtor to show cause why its case should not be converted to a case under Chapter 7 or dismissed. At the hearing on June 10, 1996, the Court denied the Procedural Motion as well as the Sale Motion for the following reasons: 1) the Sale Motion represented an impermissible attempt to alter creditors' rights outside of a plan of reorganization; 2) it failed to provide for payment of the IRS's administrative and priority claims; and 3) it improperly provided for payment of junior claims ahead of the IRS's priority claims. At the hearing on June 10, 1996, counsel to the Bank filed in open court a "Notice of Extension of Use of Cash Collateral and Borrowing Stipulation." Counsel to the Bank represented that the Debtor and the Bank had agreed to continue the borrowings for one week until June 17, 1996 on the same terms previously allowed by the Court. Attorney Riordan was present at the hearing and did not comment on the extension of the borrowing stipulation. Accordingly, at the June 10, 1996 hearing, the Court continued the Borrowing Motion as well as the show cause order to a hearing on June 17, 1996.

On June 12, 1996, the IRS filed a "Request for Payment of Internal Revenue Taxes" in the total sum of $239,581.83 (the "IRS administrative claim"), through which the IRS as-

serted postpetition administrative claims for withholding FICA and FUTA taxes, interest and penalties for the periods ending June 30, 1995 and December 31, 1995. The next day, the Bank filed an Emergency Motion for Relief from Automatic Stay to Permit Collection or Sale of Accounts Receivable and Liquidation of Tangible Collateral (the "Lift Stay Motion"). The Court heard the Bank's Motion on June 17, 1996.[5] Attorney Riordan was present at the hearing but did not voice an objection to, or make any comment on, the Bank's Lift Stay Motion. After hearing the matter, the Court found that the Bank's proposal of an orderly and commercially reasonable liquidation of the Debtor's assets as a going concern would maximize the amount realized by the Debtor's creditors. Accordingly, the Court entered an order granting the Lift Stay Motion. In its order, the Court made the following findings:

(1) Notice given is sufficient under the circumstances.

(2) A reorganization of the Debtor is improbable and no equity exists in Debtor's assets pledged to Fleet National Bank ("Fleet").

(3) There is no way to provide adequate protection to Fleet.

(4) Fleet is owed in excess of Two Million Eight Hundred Thousand ($2,800,000.00) Dollars by the Debtor, which obligations are secured by *inter alia* by valid, perfected first security interests in all of the Debtor's accounts, inventory and most other business assets except specific pieces of equipment in which Fleet holds liens pursuant to Court Order subject to valid, perfected pre-petition security interests.

(5) Fleet and the estate will most likely incur significant unrecoverable expenses unless a prompt liquidation of the assets pledged to Fleet takes place.

The Court also made the following ruling:

Fleet National Bank ... [is] ... relieved of all stays imposed by the Bankruptcy Code including, but not limited to, that imposed by Section 362, and is authorized to collect or sell any accounts of Debtor, and exercise all of its rights and remedies in connection with the Debtor's accounts, inventory, machinery, equipment, furniture and fixtures, all in accordance with its Security Agreements and the Uniform Commercial Code by either public or private sale. Debtor shall deliver possession to Fleet upon Fleet's request.

In addition, at the hearing on June 17, 1996, counsel to the Bank filed a Notice of Extension of Use of Cash Collateral and Borrowing Stipulation. Counsel to the Bank represented in open court that the Bank and the Debtor had agreed to continue the previously authorized borrowing arrangements through July 16, 1996, for a variety of reasons, including the maximization of collections of the Debtor's accounts receivable. The Court approved the extension of the borrowing stipulation. Attorney Riordan did not comment on or object to the extension of the borrowing stipulation through July 16, 1996, nor did the United States appeal the Court's orders of June 17, 1996.

On June 13, 1996, four days prior to the hearing on Fleet's Lift Stay Motion, the Chief of the Civil Trial Section of the Tax Division of the United States Department of Justice wrote a letter to the Chief of the Collection Branch of GSA (the "June 13 letter"), stating:

This will confirm your discussion on this date with Attorney Henry J. Riordan of this office and Susan Postwistilo of the Boston United States Attorney's office during which you were instructed to hold all payments being made to the debtor Calore Express Company, Inc. d/b/a Calore Freight Systems. The debtor owes the United States at least $239,581.83 for post-petition federal tax liabilities (liabilities that accrued after May 11, 1995).

The Tax Division instructed GSA:

"to hold all payments being made to the debtor Calore Express Company, Inc., d/b/a Calore Freight Systems."

The Tax Division also stated the following in its letter:

At this time, do not send any payments to the Internal Revenue Service, or make any offsets. We will ask the United States

---

5. The United States was given notice of the June 17, 1996 hearing.

Bankruptcy Court for permission to effectuate an offset if you accumulate any payments.

Copies of the June 13 letter were sent to Donald K. Stern, the United States Attorney for the District of Massachusetts, and Gerald J. O'Toole, Esquire, District Counsel to the IRS in Boston. Copies were not sent to either the Bank's counsel or the Debtor's counsel.

On June 30, 1996, the Debtor filed an Emergency Motion Requesting an Emergency Hearing on the Internal Revenue Service's Alleged Violation of the Automatic Stay under Section 362(a)(4). In this Court's absence, Bankruptcy Judge Hillman heard the matter on July 2, 1996. At the hearing, counsel to the Debtor argued that the IRS violated the automatic stay in sending the June 13 letter. He represented that the Debtor did not become aware of the freeze on the accounts receivable from GSA until June 27, 1996, that the IRS never gave notice to the Debtor of the freeze, and that Attorney Riordan, appearing on behalf of the IRS at the June 17, 1996 hearing on the Lift Stay Motion, did not disclose the freeze to the parties or to the Court. At the hearing, the United States argued that its actions were sanctioned by the decision of the United States Supreme Court in *Citizens Bank of Maryland v. Strumpf*, — U.S. ——, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995). Judge Hillman disagreed with the IRS, noting that the United States had not only failed to file a motion for relief from stay within days of its actions, but had not even filed a motion for relief from stay as of July 2, 1996, the date of the emergency hearing. Moreover, Judge Hillman ruled that, at the June 17, 1996 hearing on the Bank's Lift Stay Motion before this Court, Attorney Riordan had violated his ethical obligations to the parties, in particular to the Bank, which had agreed to further lend monies to the Debtor to be secured by accounts receivable, and to the Court by failing to disclose that the IRS had directed GSA to withhold payment from the Debtor on account of monies due for services rendered. Accordingly, Judge Hillman entered an order requiring the United States to release its instructions to GSA not later than July 2, 1996 at 4:00 p.m. The United States complied with the order.

On July 15, 1996, the United States filed the Motion to Setoff. The United States attached to its Motion, as Exhibit B, a copy of its proof of claim for prepetition taxes dated January 25, 1996. The claim contained the following statement: "This claim is not subject to any setoff or counterclaim." The United States also attached to its Motion, as Exhibit C, a copy of its Request for Payment of $239,581.83 in postpetition taxes. The Request for Payment dated June 6, 1996 contained no assertion of a right to setoff.

Both the Debtor and the Bank objected to the United States' Motion to Setoff, which the Court heard on July 30, 1996. At the conclusion of the hearing on July 30, 1996, the Court ordered the United States to file a statement of its liens against the Debtor and ordered the Bank to file a statement with respect to its private sale of its collateral. The United States filed both a Supplemental Memorandum and a Declaration indicating that there are no federal tax liens on file under the name of Calore Express Company, Inc., but that there are federal tax liens on file under the name "CFS Air Cargo, Inc.," which the United States contends is the alter ego of the Debtor.

The Bank submitted the Affidavit of Cynthia G. Stannard ("Stannard"), a Vice–President of Fleet. In her affidavit, Stannard indicated that, in connection with its foreclosure sale of the Debtor's assets, Fleet received two promissory notes in the total sum of $950,000.00, payable between 90 days and five years, relating to the foreclosure sale of its collateral. She also indicated 1) that as of August 1, 1996, the Bank was owed $2,925,986.05 plus accrued but unpaid interest of $404,477.68 and legal fees in excess of $75,000.00; and 2) that the Debtor owed Shawmut Bank, N.A. $2,870,643.25 at the commencement of the case.

## III. DISCUSSION

■ The Bankruptcy Code does not create a right of setoff. Rather, 11 U.S.C. § 553 preserves whatever rights exist under non-bankruptcy law. In *In re Saugus General Hospital, Inc.*, 698 F.2d 42, 44–45 (1st

Cir.1983), the United States Court of Appeals for the First Circuit determined that setoff rights were governed by "Massachusetts' basic common-law setoff doctrines." [6] Although section 553 does not specifically authorize setoff of postpetition obligations, setoff of mutual postpetition debts is permitted. *In re Alfar Dairy, Inc.*, 458 F.2d 1258 (5th Cir.), *cert. denied,* 409 U.S. 1048, 93 S.Ct. 517, 34 L.Ed.2d 501 (1972).

■ In the context of a bankruptcy case, setoff is not automatic. *Darr v. Muratore,* 8 F.3d 854 (1st Cir.1993). In *Darr,* the First Circuit Court of Appeals observed that "allowing setoff undermines a basic premise of bankruptcy law, equality among creditors, by 'permit[ting] a creditor to obtain full satisfaction of a claim by extinguishing an equal amount of the creditor's obligation to the debtor ... in effect, the creditor receives a "preference." ' " *Id.* at 860 (quoting *In re Braniff Airways, Inc.,* 42 B.R. 443, 448 (Bankr.N.D.Tex.1984)).

■ A creditor asserting a right of setoff has the burden of establishing its entitlement to setoff. In other words, it must establish that "the debt and claim ... [are] ... mutual—that something is owed by both sides." *In re Apex International Management Services, Inc.,* 155 B.R. 591, 593 (Bankr.M.D.Fla.1993), *aff'd,* 1996 WL 172210 (M.D.Fla.1996). Additionally, the creditor must establish that the debts are in the same right and between the same parties, standing in the same capacity. *WJM, Inc. v. Massachusetts Dept. of Public Welfare,* 840 F.2d 996, 1011–1012 (1st Cir.1988). This requirement of "mutuality" is strictly construed. *Kitaeff v. Vappi & Co., Inc. (In re Bay State York, Inc.),* 140 B.R. 608, 613 (Bankr.D.Mass. 1992). Moreover, the allowance or disallowance of a setoff is a decision that rests within the sound discretion of the court. *Id.* (citing *Cumberland Glass Mfg. Co. v. DeWitt & Co.,* 237 U.S. 447, 35 S.Ct. 636, 59 L.Ed. 1042 (1915); *Melamed v. Lake Co. National Bank,* 727 F.2d 1399 (6th Cir.1984); *In re Blanton,* 105 B.R. 321 (Bankr.E.D.Va.1989)).

■ A creditor otherwise entitled to setoff may waive the right to setoff if the setoff is not timely asserted. *Apex International,* 155 B.R. at 594; *In re Aquasport,* 115 B.R. 720 (Bankr.S.D.Fla.1990), *aff'd,* 155 B.R. 245 (S.D.Fla.1992), *aff'd,* 985 F.2d 579 (11th Cir. 1993) (court found that creditor did not procedurally waive its right to setoff). *See also In re Custom Center, Inc.,* 163 B.R. 309 (Bankr.E.D.Tenn.1994) (equitable doctrine of waiver may bar setoff, but waiver is not automatic by creditor's failure to assert setoff in proof of claim); *In re Brockton Shoe Mfg. Co.,* 8 F.Supp. 959 (D.Mass.1934) (bank estopped from claiming setoff because trustee detrimentally relied upon bank's prior waiver of its right to set off debtor's deposit against debt).

In *Apex International,* the court considered a complaint filed by a secured creditor for turnover of a sum of money held by a Chapter 7 trustee. The defendant, the United States (IRS), asserted a right to setoff the funds owed to the debtor's estate, which represented settlement proceeds from a contract between the debtor and the Air Force, to satisfy pre- and postpetition tax obligations of the debtor. The secured party plaintiff had an interest in the proceeds from the contract pursuant to a perfected security interest in the debtor's accounts receivables. The court had entered an adequate protection order relating to this interest and the United States and the Air Force had received notice and failed to object. The IRS filed a claim for unpaid prepetition taxes and unpaid postpetition taxes. The claim for prepetition taxes contained a statement that the amounts due were not subject to any setoff, while the claim for postpetition taxes contained no reference to a right of setoff. The IRS subsequently amended the claims to assert a right of setoff. The court, in ruling against the United States, stated the following:

> The Service was aware of debtor's claims against the government because it knew of this Court's order granting plaintiff [se-

---

**6.** In *Saugus Hospital,* the court noted that Massachusetts occupies a minority position with respect to the setoff rights of secured parties and that a creditor who is fully secured loses his

setoff rights. 698 F.2d at 45. The discussion is inapplicable to the instant case where it is undisputed that the United States has no liens that secure its postpetition claim.

cured party] an interest in the proceeds of debtor's government contracts. The government had knowledge of the Order because the United States and the Air Force were defendants in the adversary proceeding that resulted in the adequate protection order. . . .

\* \* \* \* \* \*

Plaintiff spent two years and substantial funds pursuing debtor's claims against the Air Force while the Service did nothing. It was silent until after plaintiff realized a benefit from its efforts. The Service waited to amend its claims until after the settlement even though it had prior knowledge of debtor's claims. The only action the Service took to protect its interest was the addition of the set-off notation on its claims. Clearly, it allowed plaintiff to rely to its detriment on the information provided in its original proof of claim that no offset existed. The plaintiff detrimentally relied by spending time and money pursuing debtor's claims against the government pursuant to the security interest recognized in the adequate protection order while the Service waited until plaintiff prevailed to assert a right.

155 B.R. at 595. The court in *Apex International* highlighted the conduct of the IRS which compelled it to find a waiver. The *Apex International* case is analogous to the instant case. However, the facts in this case are more compelling than those found by the *Apex* court.

■ In the present case, the Court need not decide whether the United States has established mutuality between its several agencies and the Debtor for setoff purposes, although there are significant legal and factual issues surrounding such a determination.[7] The Court finds that the United States unequivocally waived its right to assert a setoff by 1) failing to object to the numerous requests for orders authorizing the Debtor to borrow from the Bank against its accounts receivable, including those due from the

United States, on a secured and superpriority basis; 2) failing to object to the Bank's Lift Stay Motion in which the Bank expressly stated its intention to liquidate its collateral, including the accounts receivable; 3) expressly stating in its Second Proof of Claim dated January 25, 1996 and the attachment that its claim for prepetition taxes was not subject to setoff; and 4) failing to assert a right to setoff in any of its Requests for Payment of Postpetition Taxes, notwithstanding the existence of a right to setoff that would have been available to the United States because of the Debtor's failure to pay postpetition taxes and the Debtor's sizeable business relationship with GSA.

In its Memoranda, the United States argues that the right of setoff is an equitable remedy; that it should have at least the same rights to setoff as any creditor; and that it is entitled to setoff its postpetition claim for taxes against monies owed to the Debtor by GSA. The Court agrees with the first two premises. However, the United States neglects to observe that it failed to give notice of or assert its right to setoff in a timely manner. Although it received notice of the Debtor's Borrowing Motion and the numerous hearings conducted by this Court every thirty to sixty days with respect to that motion, the United States failed to object or to state at any time that it intended to assert a right of setoff.

The Bank advanced sums to the Debtor in reliance upon this Court's authorization of a security interest in the form of a superpriority administrative claim and postpetition liens. The Bank's advances under the lending formula approved by the Court enabled the Debtor to service its customers, including GSA, and to generate accounts receivable, while it attempted to reorganize. When the Debtor's reorganization efforts failed, which failure is alleged to have resulted from a change in position by the IRS, the Bank moved for relief from the automatic stay to collect and liquidate its collateral, including

---

7. The Court recognizes a split of authority as to whether mutuality exists for setoff purposes between a bankruptcy estate and various federal agencies such as the Internal Revenue Service and the GSA. *See In re Lopes*, 197 B.R. 15 (Bankr.D.R.I.1996), and case cited therein. In light of the Court's ruling in this case, it is unnecessary for the Court to decide which approach to adopt.

the accounts receivable. The United States failed to comment on or to object to either the granting and continuation of the Bank's postpetition loans secured by the Debtor's accounts receivable or the allowance of the Bank's Lift Stay Motion, pursuant to which the Bank sold the Debtor's assets subject to its security interest as a going concern. At the June 17, 1996 hearing, the United States, through its attorney, remained silent, despite its knowledge that 1) the Bank, which had just been granted relief from stay to foreclose on its collateral, had agreed to make additional loans to the Debtor to be secured by accounts receivable; 2) the Tax Division had directed GSA to freeze its payments to the Debtor; and 3) it would be claiming that it had a right to setoff its claim for pre- and postpetition taxes against the Debtor's account receivable from GSA. Indeed, the United States waited approximately one month after the June 17, 1996 hearing before it even filed its own Motion for Relief from Stay seeking permission to setoff. The Bank and the other parties attempting to maximize the amount realized from the sale of the Debtor's collateral by preserving the going concern value of the Debtor's business relied upon the government's silence to their detriment. Under the circumstances of this case, the statement made by the United States in its objection to the Debtor's plan filed on April 1, 1996, referring only generally to the preservation of any prepetition right of setoff, without specifying any facts to substantiate the applicability of that right, was insufficient to preserve the postpetition setoff right now asserted by the United States.

Allowing the United States to benefit from a setoff in the instant case would constitute an abuse of this Court's discretion and a perversion of its equitable powers. The United States's attempt at ambush by silence is unconscionable and will not be permitted. The venerable maxim, "he who seeks equity must do equity,"[8] precludes the relief the United States requests.

 Although not argued by either the Bank, the Debtor or the United States, there is an additional reason that mandates denial of the Motion to Setoff. Article 9 of the Uniform Commercial Code governs the priority between a right to setoff and a perfected security interest, notwithstanding section 9–104,[9] which section relates only to filing requirements for perfection and not to priorities between competing interests.[10] *In re Apex Oil Co.*, 975 F.2d 1365, 1367–68 (8th Cir.1992); *Credit Alliance Corp. v. National Bank of Georgia*, 718 F.Supp. 954 (N.D.Ga. 1989); *In re Gibson Group, Inc.*, 126 B.R. 759 (Bankr.S.D.Ohio 1991). *See also In re Otha C. Jean & Assoc.*, 152 B.R. 219 (Bankr. E.D.Tenn.1993). Thus, a lender with a perfected security interest has priority over a creditor with a right of setoff where the setoff right did not arise until after the perfection of the security interest. *Credit Alliance*, 718 F.Supp. at 958. A creditor's right of setoff is subordinate to the claim of a creditor with a security interest in accounts receivable that was perfected before the right of setoff arose. *Gibson Group*, 126 B.R. at 762.

 In the present case, the Bank holds a valid, perfected, first security interest in all of the prepetition accounts receivable of the Debtor, which security interest was perfected in June of 1993. Additionally, pursuant to the interim Borrowing Order dated May 17, 1995 and the final Borrowing Order dated June 27, 1995, neither of which was appeal-

---

**8.** *See K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 910 (1st Cir.1989).

**9.** Section 9–104 provides in relevant part the following: "This Article does not apply ... (i) to any right of setoff...." M.G.L. c. 106, § 9–104.

**10.** Section 9–312 provides in part:
... (5) In all cases not governed by other rules stated in this section ... priority between conflicting security interests in the same collateral shall be determined according to the following rules:

(a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.
(b) So long as conflicting security interests are unperfected, the first to attach has priority....
M.G.L. c. 106, § 9–312.

ed,[11] this Court granted the Bank a superpriority lien on the Debtor's accounts receivable and a superpriority administrative expense claim in this case. The United States acknowledged that GSA owes the Debtor approximately $25,000 for prepetition services but provided no supporting facts or details as to when the credit arose. Additionally, the United States acknowledged that GSA owes the Debtor an unspecified sum for postpetition services during the pendency of this Chapter 11 case. Again, it provided no facts or details with respect to the postpetition credits due to the Debtor. Thus, the Court is unable to find that the credit due the Debtor that allegedly gives rise to the right of setoff asserted by the United States necessarily arose before perfection of the Bank's security interest. Because the United States has not demonstrated that its setoff rights arose prior to the perfection of the Bank's lien on accounts receivable, it has not sustained its burden of demonstrating entitlement to setoff. Accordingly, in light of the Borrowing Orders granting a senior lien to the Bank on accounts receivable, the Court rules that any setoff rights asserted by the United States are subject to the Bank's lien. Even in the absence of a waiver by the United States, the Court finds that the Bank's security interest in accounts receivable has priority as a matter of law over the United States' right of setoff.

 In reaching the above conclusions, the Court makes no findings and expresses no opinion as to the arguments advanced by the Debtor and the Bank that the Court should order the equitable subordination of the IRS's claims pursuant to 11 U.S.C. § 510(c). These allegations must be the subject of an adversary proceeding commenced by the estate representative. *See* Fed. R.Bankr.P. 7001(7), (8).

## IV. CONCLUSION

In accordance with the foregoing, the Court finds that the United States waived its right to assert a setoff of pre- and postpetition obligations owed by GSA to the Debtor against pre- and postpetition taxes owed by the Debtor to the IRS. In short, the Court finds that it would be inequitable for the United States to obtain a "preference" over other administrative creditors of this estate. In the alternative, the Court finds that, as a matter of law, the Bank's security interest in accounts receivables has priority over the right of setoff asserted by the United States. For the foregoing reasons, the Court refuses to permit the requested setoff and denies the Motion of the United States for Relief from the Automatic Stay.

---

11. In the Borrowing Orders dated May 17, 1995 and June 27, 1995, the Court ordered that any party challenging the Bank's prepetition or postpetition liens was required to do so within 60 days from the appointment of counsel to the creditors' committee. No party in interest, including the United States, challenged the Bank's liens.