# United States Court of Appeals
## For the First Circuit

_____

No. 01-1464

IN RE: CALORE EXPRESS COMPANY, INC.,

Debtor.

_____

UNITED STATES,

Appellant,

v.

FLEET BANK OF MASSACHUSETTS,

Appellee.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

_____

Before

Lynch, Circuit Judge,
Campbell, Senior Circuit Judge,
and Lipez, Circuit Judge.

_____

Peter Sklarew, Attorney, Tax Division, Department of Justice, with whom Claire Fallon, Acting Assistant Attorney General, and D. Patrick Mullarkey, Acting Deputy Assistant Attorney General, were on brief for appellant.
Debra K. Mayfield with whom Deborah J. Hart-Klein and Ruberto, Israel & Weiner, P.C. were on brief for appellee.

_____

May 2, 2002

_____

**LYNCH**, **Circuit Judge**.  This is a bankruptcy case in which the federal government asserts a right to set off the claims of two agencies, the Internal Revenue Service and the General Services Administration, against contract claims of the debtor as to the General Services Administration.  If the government is correct, Fleet Bank of Massachusetts owes it several hundred thousand dollars, almost all from unpaid tax claims against the now-defunct debtor.  Proceedings before the bankruptcy court did not go smoothly, primarily because the government did not keep the court or the other parties informed of its intent to assert its setoff rights or of the steps it took to do so.  As a result we face, some seven years into the life of the case, the government's appeal of the bankruptcy court's ruling in a summary hearing that the government either waived its setoff rights or had no rights to assert.  The debtor by now is long gone, and the government wishes to seek restitution from Fleet, the debtor's primary creditor, which the bankruptcy court permitted to sell the debtor's assets.

We reverse the entry of judgment against the government, because the bankruptcy court could not draw the legal conclusions it did without developing facts to support them and because we disagree with its conclusions about the priority of the government's setoff rights under the Uniform Commercial Code as interpreted by the Massachusetts courts.  Our decision today does not guarantee the government success on its restitution claim if and when a court better develops the facts involved in this case.  We then remand the case to the district court for appropriate

-2-

disposition.

The decision does resolve some important questions. The following aspects of this opinion either decide new issues or clarify areas of the law:

1. We hold that this court has jurisdiction to review an order of the bankruptcy court refusing to lift the automatic stay when the order resolves all issues between the parties.

2. We further define the scope of a hearing on a motion for relief from the automatic stay before the bankruptcy court under the Federal Rules of Bankruptcy Procedure and Grella v. Salem Five Cent Savings Bank, 42 F.3d 26 (1st Cir. 1994). We conclude that the question of waiver by a party of its rights is not outside the permissible scope of such a hearing.

3. We set forth principles for determining whether a creditor has waived the right of setoff in a bankruptcy proceeding. We hold that a creditor in bankruptcy proceedings may expressly waive a right of setoff; that a court may imply a waiver of a right of setoff from the creditor's conduct if that conduct fairly demonstrates the creditor's intent; and that a waiver of setoff rights, whether express or implied, is not necessarily irrevocable unless the case is a proper one for a court to apply estoppel.

4. We hold that although priority of the federal government's rights to set off claims against debts is a matter of federal common law, federal common law for present purposes incorporates state law, in this case section 318 of pre-revision Article Nine of the Uniform Commercial Code.

We also reject the argument of the IRS that it should be excused from an error it made in filling out a government form.

I.

The legal questions presented by this case turn largely on its history. That history is complex, and we recount it in some detail. Calore Express Company filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code on May 5, 1995, in the District of Massachusetts. Calore had done business as a freight transportation company since its founding in the late 1940s, its

-3-

operations diversifying over time. In the mid-1990s, however, Calore's business suffered from increased competition and a series of mishaps, until a threat by one of Calore's lenders to foreclose liens on some of its equipment led to the 1995 Chapter 11 filing.

Among Calore's largest creditors at the time was Shawmut National Bank.[1] Before the petition, Calore owed Shawmut approximately $2.8 million, and Shawmut had a security interest in many of Calore's assets, including its accounts receivable. After the petition, Calore remained debtor-in-possession and asked the bankruptcy court to permit it to reach an emergency financing agreement with Shawmut. Shawmut agreed to continue lending, with the amount of the loans determined partly by Calore's postpetition accounts receivable, and partly by the amount of those accounts collected. To secure this new credit, Calore asked the court to give Shawmut a superpriority claim and a security interest in all its assets under 11 U.S.C. § 364(c), including assets acquired postpetition and both pre- and postpetition accounts receivable. The bankruptcy court approved this arrangement in an interim order on May 17 and in numerous subsequent periodic orders beginning on June 28, 1995. The June 28 order read in relevant part:

> Lender shall have a super-priority claim . . . with respect to obligations incurred pursuant to the [loan] over any and all administrative expenses [with exceptions not relevant here].

> The Debtor is hereby authorized to grant and by entry of this Order does grant a security interest in all post-petition assets to the Lender and valid, binding, enforceable and perfected Liens in and to all collateral

---

[1] Shawmut Bank is no more, and Fleet stands in its shoes.

> security . . . including, without limitation,
>
>> All . . . accounts . . . now owned or in which the Debtor has any interest including all pre-petition collateral . . . or hereafter acquired or in which the Debtor obtains an interest . . . .

Eventually the court permitted Calore and the Bank to renew the arrangement by simple stipulation. The court held hearings during this time to monitor Calore's borrowing.

Calore had done business with the General Services Administration, and forthcoming payments from the GSA made up part of the accounts receivable on which Calore was borrowing. Calore also owed money to the Small Business Administration and the Internal Revenue Service. At the beginning of the case, therefore, there existed at least the possibility that the government might attempt to set off the GSA's debts to Calore against Calore's debts to the government. Nothing in the record reveals the scope of the GSA's contractual obligations at that time, or whether it was predictable that the GSA would continue to make postpetition payments to Calore.

Calore's debts to the IRS arose from its failures to pay various payroll taxes withheld from its employees' wages. Some of these failures were prepetition, some postpetition. On December 7, 1995, and January 25, 1996, the IRS through its own counsel filed proofs of claims for prepetition taxes. The second proof claimed dramatically more than had the first because the IRS then took the position that Calore was liable for certain taxes incurred by another corporation, CFS Air Cargo, a corporation nominally

separate from Calore but which the IRS considered Calore's alter ego. As of January 25, 1996, the IRS amended its proof to claim a total of $3,105,612.90 in prepetition taxes, including penalties and interest.

As to postpetition debts, on November 20 and December 5, 1995, on February 28 and June 6, 1996, and on September 23, 1997, the IRS filed requests for payment of the postpetition payroll taxes as administrative expenses under 11 U.S.C. § 503(b). As of September 23, 1997, the IRS claimed a total of $479,134.77 in postpetition taxes, including penalties and interest. Calore disputed the exact amounts of the pre- and postpetition tax debts, and these amounts have not yet been established by any court. The GSA through its own counsel also filed a proof of claim on February 1, 1996, claiming that Calore owed it $6,734.24 in overcharges.

None of these filings informed the court or the other parties of any specific intention by the government to set off the GSA's debts to Calore against Calore's tax debts, or of whether the GSA would continue to incur debts to Calore. Some contained language disclaiming setoffs. For example, the IRS filed its prepetition proofs of claim on then-current copies of Official Bankruptcy Form 10. Form 10 then stated that "[i]n filing this claim, claimant has deducted all amounts that claimant owes to debtor";[2] an attachment, entitled "Proof of Claim for Internal

---

[2] A new version of Form 10, issued since the events in this case, omits this language and clearly states that a creditor should list any claim subject to setoff as a secured claim and identify the setoff.

-6-

Revenue Taxes," stated that "[t]his claim is not subject to any setoff or counterclaim." Moreover, although a setoff claim qualifies as a secured claim under 11 U.S.C. § 506(a), in its December 7 filing, the IRS identified its entire prepetition claim, then amounting to $146,609.36, as unsecured, although it specified that $133,281.24 of the claim should receive priority status under 11 U.S.C. § 507(a)(8). In its later January 25 filing, the IRS identified $2,448,520.69 of its $3,105,612.90 claim as secured, $572,683.35 as priority unsecured, and $84,408.86 as general unsecured. The security interest it identified was a tax lien against CFS. It left unchanged the language of Form 10 concerning the deduction of amounts owed and the language in the attachment concerning the absence of setoffs and counterclaims. There is no determinative evidence as to whether IRS employees actually knew that the GSA owed Calore money at the time of any of these filings.

The GSA's proof of claim was also filed on Form 10, but included next to the language concerning the deduction of amounts owed a notation referring to an attached affidavit. That affidavit stated that the government intended to assert its right of setoff and that the government was holding receivables to do so.

At no time before or after any of these various proofs of claim did the bankruptcy court fix a bar date, after which new proofs of claim or amendments would be untimely. See Fed. R. Bankr. P. 3003(c)(3).

Calore proposed its final plan of reorganization, after two earlier attempts, on March 8, 1996. The March 8 plan provided

-7-

for the payment of $131,810.00 in prepetition taxes over time and $129,243.79 in postpetition taxes immediately. The government objected to the plan on April 1, arguing that Calore had vastly understated the amount it owed in both pre- and postpetition unpaid payroll taxes, and that a valid plan would need to account for the higher amounts reflected in the IRS's proofs of claim and requests for payment. The dispute between the government and Calore at that time revolved primarily around whether Calore was liable for the tax debts of CFS Air Cargo. The IRS's April 1 objection included an assertion of the government's general right to set prepetition debts off against prepetition claims, stating that "[t]he Bankruptcy Code specifically preserves the United States' right to offset any pre-petition claims of the United States against any pre-petition claims of the Debtor." It did not specifically mention the setoff of the GSA's debts. On April 24, the IRS and Calore stipulated that Calore owed approximately $1,685,886.74 in prepetition taxes. This admission doomed the reorganization plan, as the amount admitted was too great for Calore to repay. The IRS and Calore moved on the same day to continue the trial, with Calore stating that it intended to propose a sale of assets under 11 U.S.C. § 363.

Calore moved for that sale on May 31. The proposed buyer was JSC Investments, a corporation owned by the wife of Calore's president. Calore's plan for the sale involved paying $137,000 to the IRS. The court set a hearing for June 10, and also ordered Calore to show cause at that time why the court should not dismiss

the case, or convert it to Chapter 7, or appoint a Chapter 11 trustee. The court held the hearing and denied the motion for sale, reasoning that the sale of assets as described would amount to a plan of reorganization and therefore needed to satisfy the Code's various requirements for such a plan -- including full disclosure to creditors, a vote of creditors, and adherence to the absolute priority rule and the best interests of the creditors test. The court placed particular emphasis on the motion's failure to address the claims of the IRS. It continued the show cause hearing until June 17. Three days later, on June 13, Fleet, which had by then acquired Shawmut, moved to lift the automatic stay on collection of debts against Calore that the bankruptcy court had imposed under 11 U.S.C. § 362(a)(4) at the beginning of the case, so that Fleet could seize Calore's assets. The court set a hearing for June 17, at which several of the other creditors who had moved for relief from the stay much earlier in the case were also to be heard.

That same day, June 13, the Assistant Attorney General for the Tax Division of the Department of Justice sent a letter to the Chief of the Collections Branch of the GSA. The letter described and confirmed a phone conversation earlier that day involving counsel for the IRS in this case,[3] an attorney from the U.S. Attorney's Office for the District of Massachusetts, and the recipient. The letter instructed the GSA to freeze all further

---

[3] The IRS attorney who made the phone call did not appear for the government before this court.

payments to Calore on postpetition accounts, and to contact IRS counsel before making any payments to Calore or CFS on prepetition accounts. The letter also instructed the GSA not actually to set off any of the disputed funds until the government had received permission to do so from the bankruptcy court. The government did not then notify the bankruptcy court or any other party of the June 13 letter. The government says that at the time of the letter, counsel for the GSA had erroneously informed counsel for the IRS that the GSA had no current receivables due to Calore, and that this explains IRS counsel's failure to notify the court or other parties. The government also says that the letter was intended as a mere precaution in case counsel for the GSA was wrong or in case new receivables did accrue. In any event, the parties do not dispute that the GSA in fact owed Calore substantial funds and that after June 13 the GSA ceased to pay.

The court held a hearing on June 17 in which it granted Fleet's motion but postponed deciding those of the other creditors so that Fleet could attempt to sell the assets all at once, on the basis that such a sale would yield the best value for the assets. Calore and Fleet intended to make much the same sale, to the same buyer, as they had earlier proposed through § 363. Counsel for the IRS -- the same who had made the June 13 phone call -- was present at that hearing, but did not speak. According to Calore, it discovered the IRS's freeze on payments from the GSA on June 27 when one of Calore's drivers attempted to pick up a payment from the GSA but received instead a copy of the June 13 letter. One day

later, Fleet (notified in the interim by Calore) sent a letter to the bankruptcy court enclosing a copy of the June 13 IRS letter and requesting an emergency hearing. Calore joined in the motion, taking the position that the IRS's action violated the automatic stay.

Judge Feeney, who handled all other parts of this case, was then unavailable. On July 2, Judge Hillman convened the emergency hearing requested by Calore and Fleet. Calore and Fleet argued vehemently that the government should at the very least have mentioned the June 13 letter at the June 17 hearing, and that its undisclosed actions violated the automatic stay. Tempers ran high; counsel for Calore called the government's actions "fraud," "perhaps larceny," and "twisted." The government argued that its actions were permitted by the rule of Citizens Bank of Maryland v. Strumpf, 516 U.S. 16 (1995). The court agreed with Calore and Fleet, said that the government had attempted to "sandbag" Calore, stated that the government's actions had exceeded what Strumpf permitted, and ordered the government to lift the freeze.

The government then moved to lift the stay so that it could replace the freeze and impose an actual setoff, or, in the alternative, for adequate protection of its interest in the accounts receivable. This motion, filed on July 15, asserted the government's right to set off all of its prepetition claims, including the tax debts and the GSA overcharges, against its prepetition debts, which comprised part of the GSA receivables. It also asserted the government's right to set off its postpetition

-11-

claims, which were entirely tax debts, against its postpetition debts, the remainder of the GSA receivables. Fleet objected, claiming that its security interest and superpriority status, both created by the bankruptcy court's borrowing order, took priority over the government's setoff rights. Fleet also urged the court to deny the government's motion on the grounds of estoppel, laches, and inequitable conduct on the government's part. Calore objected on similar grounds, adding that to grant the government's motion would destroy the going concern value of Calore's business.

On July 30, Judge Feeney held a hearing on the government's motion to lift the stay. At that hearing, the government asked to impose the freeze once again at least until the court ruled on the motion. In response, counsel for Fleet stated that if the court ruled for the government after the receivables were paid, Fleet would "disgorge" the money owed to the government; the court and the government agreed that this suggestion was reasonable. On August 8, before the court issued its decision, Fleet filed a supplemental submission informing the court and the parties of its private sale of Calore's assets. At that sale, Fleet received the total amount of $2,343,812.84, primarily in new promises to pay. Some of that amount -- we cannot say exactly how much from the record -- presumably went to pay other secured creditors. Fleet claimed that as of August 1, Calore owed it $2,925,986.05, plus additional unpaid interest and legal fees. Under an agreement with the buyer, the same JSC Investments to whom Calore and Fleet had proposed a § 363 sale, Fleet took an

assignment of the accounts receivable, the collection of which would go to satisfy the new promissory notes.  JSC received a portion of the accounts as costs of collection.

On August 21, the court denied the government's motion to lift the stay and its alternative request for adequate protection in a published opinion.  In re Calore Express Co., 199 B.R. 424 (Bankr. D. Mass. 1996).  The court concluded that the government had no right of setoff in this case because, first, the government had waived any such right on several distinct grounds, including its failure to object to the original borrowing order, its failure to object to Fleet's June 13 motion,[4] its statements in its proofs of prepetition claims, and its silence in its requests for payment of postpetition expenses, id. at 432; second, allowing the exercise of such a right would be inequitable, id. at 433; and third, Fleet's security interest created by the borrowing orders took priority over any right of setoff even had the government not

---

[4]     In the course of describing the government's conduct, Judge Feeney's opinion stated that "Judge Hillman ruled that, at the June 17, 1996 hearing on the Bank's Lift Stay Motion before this Court, [counsel for the IRS] had violated his ethical obligations to the parties . . . and to the Court."  Calore Express, 199 B.R. at 430.  The government and the counsel concerned petitioned the district court for a writ of mandamus on the grounds that the bankruptcy court had reprimanded counsel for professional misconduct without notice or a hearing.  The district court issued the writ, directing the bankruptcy court to clarify what finding it had intended to make regarding counsel.  In re Calore Express Co., 226 B.R. 727, 733 (D. Mass. 1998).  Judges Feeney and Hillman then issued separate memoranda, each of which stated that the author had not intended to impose sanctions on the attorney concerned or to find him guilty of professional misconduct.  In re Calore Express Co., 228 B.R. 338 (Bankr. D. Mass. 1998) (Feeney, J.); In re Calore Express Co., 228 B.R. 338 (Bankr. D. Mass. 1998) (Hillman, J.). Both judges also stated that nothing in the memoranda was to affect the August 21 order.

waived it, <u>id.</u> at 433-34.  The court declined, however, to reach Fleet's arguments based on equitable subordination, noting that the Federal Rules of Bankruptcy Procedure require an adversary proceeding for such claims.  <u>Id.</u> at 434.  The government appealed to the district court.  On October 31, 2000, the district court affirmed in an unpublished opinion relying solely on the government's waiver of its right of setoff, without reaching the question of that right's relative priority.  After the district court denied rehearing, the government took this appeal.

II.

The parties' arguments cover a broad range of procedural and substantive questions.  The government's primary request is that we reverse the order of the bankruptcy court denying the government's motion to lift the automatic stay.  The stay itself is now irrelevant.  Fleet has long since sold Calore's assets and collected Calore's receivables from the government.  Indeed, according to the government at oral argument, a subsequent arbitration award has added substantial additional funds to the amount the government owed Calore, and the government has paid that money in compliance with the bankruptcy court's order.  The government wishes to bring an action against Fleet for restitution of the amount that the government would have retained had it been able to exercise its setoff right in June 1996.  It takes the position that the August 1996 order of the bankruptcy court would presently preclude its suit, but that it can sue Fleet if the bankruptcy court's order is reversed.  The district court's ruling

would arguably (although not certainly) otherwise bar the government's restitution action under the doctrines of claim and issue preclusion.

The government argues: first, that a hearing on a motion to lift the automatic stay is a summary proceeding in which no final adjudication of parties' claims should be made, and so the bankruptcy court erred in ruling finally that the government had no right of setoff; second, that the automatic stay does not apply to postpetition setoffs, and so the bankruptcy court erred in making any ruling whatsoever regarding postpetition setoffs following a hearing related to the automatic stay; third, that its conduct in this litigation did not amount to waiver of its setoff rights; and fourth, that Fleet's security interest was not prior to the government's setoff rights.

Fleet, defending the bankruptcy court's order, suggests that this court lacks appellate jurisdiction. It cites the recent case of Caterpillar Financial Services Corp. v. Braunstein (In re Henriquez), 261 B.R. 67 (B.A.P. 1st Cir. 2001), in which the Bankruptcy Appellate Panel for this circuit held that an order denying a motion to lift the stay is not subject to appeal unless it finally resolves the issues between the parties. Id. at 70-71. Assuming, though, that this court exercises jurisdiction, Fleet also argues: first, that the bankruptcy court correctly concluded that the government waived its right of setoff; second, that the bankruptcy court was within its authority to deny the government setoff, whether or not that denial took place in the context of a

hearing on a motion to lift the stay, and whether the setoff related to pre- or postpetition claims and debts; third, and finally, that regardless of waiver or inequitable conduct, its security interest does indeed take priority over the government's setoff rights.

III.

A.  <u>Appellate jurisdiction</u>

We begin by considering whether we have jurisdiction to hear this appeal.  Fleet has suggested that we lack appellate jurisdiction, citing <u>Henriquez</u>.  That case held that a bankruptcy court's denial of a motion for relief from an automatic stay is not final unless it determines all the rights of a party, and so is not subject to an appeal as of right under 28 U.S.C. § 158(a)(1) unless it completely resolves all issues between the parties with respect to the discrete dispute at stake in the ruling.  261 B.R. at 70. <u>Henriquez</u> acknowledged that this circuit has held that grants of a motion for relief from an automatic stay are final within the meaning of § 158(a)(1), <u>id.</u> at 70 n.5 (citing <u>Tringali</u> v. <u>Hathaway Machinery Co.</u>, 796 F.2d 553, 558 (1st Cir. 1986)), but distinguished denials of such motions, stating that the latter, in at least some cases, leave unresolved issues between the parties to be resolved by the bankruptcy court, <u>id.</u> at 70-71.  For that proposition it cited <u>Grella</u> v. <u>Salem Five Cent Savings Bank</u>, 42 F.3d 26 (1st Cir. 1994), in which this circuit described the scope of a hearing on a motion to lift the stay as circumscribed and summary.  See <u>Henriquez</u>, 261 B.R. at 70-71.

-16-

We do not reach the question whether a bankruptcy court's refusal to lift the automatic stay may ever lack finality under § 158(a)(1), as Henriquez held. Numerous circuits have held that a district court's affirmance or reversal of the bankruptcy court's decision whether to lift the automatic stay is final, often without qualifying that holding. See Barclays-Am./Bus. Credit, Inc. v. Radio WBHP, Inc. (In re Dixie Broad., Inc.), 871 F.2d 1023, 1026 (11th Cir. 1989) (collecting cases). In the present case, the bankruptcy court's order clearly did decide the relevant dispute between the parties. Acting under the June 17 order, Fleet has seized the relevant assets and sold them. The government may now recover its money only from Fleet and only on the theory that it should have been able to exercise its setoff rights as of June 13, and that it is now entitled to be made whole for its losses because it was foreclosed from exercising those rights. Calore has no money left to pay either pre- or postpetition claims, and Fleet has no obligation to pay the government unless the government can make out a restitution claim, which depends on its right of setoff. The question presented by this appeal is therefore whether the bankruptcy court correctly ruled on August 21 that the government had no remaining setoff rights, or that Fleet's rights were senior. We have jurisdiction to hear this appeal and decide that question.

B. Scope of the hearing

The government's first argument is that the bankruptcy court exceeded the scope of a hearing on a motion to lift the automatic stay by permanently foreclosing the government's right of

-17-

setoff. Section 362(d)(1) provides that the bankruptcy court shall grant relief from the stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1) (2000). The government cites Grella, in which this court held that the grant of a motion to lift the stay did not preclude the trustee in that case from later contesting the validity of the claim or asserting a counterclaim. 42 F.3d at 32-33. The government also argues that at least some of the issues decided by the bankruptcy court required it to make findings of fact, and that the court erred by deciding those issues after a nonevidentiary hearing. The government maintains that, given an opportunity, it could present evidence that would undermine the bankruptcy court's reasoning -- for example, the court's conclusion that Fleet in fact relied to its detriment on the government's failure to assert its setoff right.[5]

The government is generally correct that a hearing on a motion to lift the stay is not the proper time or place for the determination of many substantive rights. As this court said in Grella, the question for the bankruptcy court at such a hearing is generally whether the creditor's claim to the estate's property is

---

[5] The government also argues that the bankruptcy court exceeded the scope of the hearing by addressing postpetition setoff rights at all, because in the government's view postpetition setoffs are never covered by the automatic stay. The government bases this argument on a reading of 11 U.S.C. § 362(a)(7), which extends the automatic stay to cover the exercise of prepetition setoffs but by its terms does not cover postpetition setoffs. Because we hold that the bankruptcy court erred in concluding that the government had no postpetition setoff rights, we do not decide whether it lacked authority to consider those rights at all.

-18-

colorable, not whether the creditor can ultimately recover in light of all relevant legal issues.  42 F.3d at 32-34.

That does not mean, however, that such a hearing is necessarily an inappropriate time to consider issues of waiver.  A claim that has clearly been waived is no longer colorable.  See id. at 35 ("[T]he court may consider any defenses or counterclaims that bear on whether [a colorable claim] exists.").  Further, in some cases the question of waiver will be clear from the record as a matter of law or from undisputed facts.  In other cases, that question will require the bankruptcy court to take evidence, which it did not do in this case.  We consider the bankruptcy court's ruling here from that perspective: if the government has clearly, on the record or on undisputed facts, waived its setoff rights as a matter of law so as to deprive it of even a colorable claim to setoff, then the bankruptcy court was correct to conclude that those rights no longer entitled the government to move for a lift of the stay.  But if waiver was unclear from the record, or if a disputed fact could possibly make a difference, then the bankruptcy court erred.

We apply a similar analysis to the question of priority. In order to obtain relief from the stay, the government was required to show cause for relief, in addition to its colorable claim on property of the estate.  The cause the government invoked was "the lack of adequate protection of an interest in property" under § 362(d)(1).  If as of the time of the hearing Fleet indisputably had rights senior to the government's in the contested

-19-

receivables, and if Calore's debt to Fleet equaled or exceeded the value of those receivables, then the bankruptcy court correctly denied the motion to lift the stay.  This would be so not because the government lacked a colorable claim but because the government's security interest would have no value and the government would be entitled to no protection of that interest. See Superior Paint Mfg. Co. v. Lopez-Soto (In re Lopez-Soto), 764 F.2d 23, 26 (1st Cir. 1985) ("[V]alueless junior secured positions or unsecured deficiency claims will not be entitled to adequate protection." (quoting 2 Collier on Bankruptcy ¶ 362.07, at 362-53 (L. King et al. eds., 15th ed. 1985)) (internal quotation marks omitted)).  If we reject the bankruptcy court's grounds for finding waiver, then we must consider whether the bankruptcy court was correct when it concluded that, as a matter of law, Fleet's interest took priority over the government's.  This question is distinct from the question whether a court might rearrange the priorities of the interests under, for example, the doctrine of equitable subordination, which the bankruptcy court acknowledged required a full adversary proceeding.  Calore Express, 199 B.R. at 434.

There is, however, another ground on which the bankruptcy court rested its judgment, and which Fleet has argued to us.  That ground is the discretion of the bankruptcy court to grant or deny setoff.  See Cumberland Glass Mfg. Co. v. De Witt, 237 U.S. 447, 455 (1915) ("The matter [of setoff] is placed within the control of the bankruptcy court, which exercises its discretion in these cases

-20-

on the general principles of equity."). In exercising that discretion, the bankruptcy court wrote:

> Allowing the United States to benefit from a setoff in the instant case would constitute an abuse of this Court's discretion and a perversion of its equitable powers. The United States's attempt at ambush by silence is unconscionable and will not be permitted. The venerable maxim, "he who seeks equity must do equity," precludes the relief the United States requests.

Calore Express, 199 B.R. at 433 (footnote omitted).

It is not clear that the bankruptcy court had the equitable discretion it purported to exercise. The government has argued to us that setoff is in fact a legal rather than equitable doctrine and that the bankruptcy court exceeded whatever narrow discretion it might have possessed. See N.J. Nat'l Bank v. Gutterman (In re Applied Logic Corp.), 576 F.2d 952, 957-58 (2d Cir. 1978) (Friendly, J.) ("The rule allowing setoff, both before and after bankruptcy, is not one that courts are free to ignore when they think application would be 'unjust.'"); see also Cumberland Glass, 237 U.S. at 455 ("While the operation of this privilege of set-off has the effect to pay one creditor more than another, it is a provision based upon the generally recognized right of mutual debtors, which has been enacted as part of the bankruptcy act, and when relied upon should be enforced by the court.").

The Supreme Court has recently reminded the federal courts that the discretion of a bankruptcy judge is circumscribed by the Bankruptcy Code and by the underlying substantive law. See Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 24-25 (2000)

-21-

("Bankruptcy courts are not authorized in the name of equity to make wholesale substitution of underlying law controlling the validity of creditors' entitlements, but are limited to what the Bankruptcy Code itself provides."); id. at 25 (citing United States v. Reorganized CF & I Fabricators of Utah, Inc., 518 U.S. 213, 228-229 (1996), and United States v. Noland, 517 U.S. 535, 543 (1996)). Of course, to the extent that Fleet argues that the underlying law of setoff is discretionary, these recent cases do not control the outcome here. These cases may, however, represent a relevant shift from the easy appellate acceptance of broad discretion exercised by bankruptcy judges reflected in the language from Cumberland Glass on which Fleet relies.

Assuming in Fleet's favor that a bankruptcy court may properly exercise some discretion over whether to permit setoff, it must make that decision on all the facts of the case. The bankruptcy court's irritation with the government's attorney is understandable; nonetheless, its approach is difficult to reconcile with a summary hearing and impossible to reconcile with a nonevidentiary one. In this case, the government plausibly argues that its attorney did not act in bad faith by remaining silent on June 17 and that Fleet did not actually rely on the government's silence at any time in the proceedings, whether on June 17 or earlier.[6] Both questions are relevant to the equities of this

---

[6] The bankruptcy court also did not take into account whether any actual reliance of Fleet on the continuing availability of funds that Calore should have used to pay postpetition taxes was unreasonable as a matter of law. Such taxes are to be paid in the ordinary course of business. See United States v. Yellin (In re

-22-

case, and both depend on disputed factual questions such as the actual knowledge and motives of individuals, rather than on undisputed facts or on the record.  The bankruptcy court took evidence on neither.  Its decision to deny setoff as a matter of equity is not sustainable on the current record.

Thus, the remainder of our analysis focuses on two narrow questions: whether, on the record and on the undisputed facts, the government waived its right of setoff in this case as a matter of law; and whether, within the same framework, Fleet's lien takes priority over the government's setoff rights.

C.  Waiver

The bankruptcy court and the district court agreed that the government had waived any claim to setoff.  The bankruptcy court wrote:

> The Court finds that the United States unequivocally waived its right to assert a setoff by 1) failing to object to the numerous requests for orders authorizing the Debtor to borrow from the Bank against its accounts receivable, including those due from the United States, on a secured and superpriority basis; 2) failing to object to the Bank's Lift Stay Motion in which the Bank expressly stated its intention to liquidate its collateral, including the accounts receivable; 3) expressly stating in its Second Proof of Claim dated January 25, 1996 and the attachment that its claim for prepetition taxes was not subject to setoff; and 4) failing to assert a right to setoff in any of its Requests for Payment of Postpetition Taxes, notwithstanding the existence of a right to setoff that would have been available to the United States because of the Debtor's failure to pay postpetition taxes and the Debtor's sizeable business relationship with GSA.

Calore Express, 199 B.R. at 432.  The court also found significant

_____

Weinstein), 272 F.3d 39, 47 (1st Cir. 2001).

-23-

the silence of counsel for the government at the June 17 hearing:

> At the June 17, 1996 hearing, the United States, through its attorney, remained silent, despite its knowledge that 1) the Bank, which had just been granted relief from stay to foreclose on its collateral, had agreed to make additional loans to the Debtor to be secured by accounts receivable; 2) the Tax Division had directed GSA to freeze its payments to the Debtor; and 3) it would be claiming that it had a right to setoff its claim for pre- and postpetition taxes against the Debtor's account receivable from GSA. Indeed, the United States waited approximately one month after the June 17, 1996 hearing before it even filed its own Motion for Relief from Stay seeking permission to setoff. The Bank and the other parties attempting to maximize the amount realized from the sale of the Debtor's collateral by preserving the going concern value of the Debtor's business relied upon the government's silence to their detriment.

Id. at 433.

Courts use the word "waiver" to mean different things in different contexts. See generally Irons v. FBI, 880 F.2d 1446, 1452-53 (1st Cir. 1989) (en banc) (discussing the different meanings of "waiver"). In the context of bankruptcy proceedings, some courts have said that a waiver of setoff must be the intentional relinquishment of a known right. McCarty v. Nat'l Bank of Alaska, N.A. (In re United Marine Shipbuilding, Inc.), 158 F.3d 997, 1001 (9th Cir. 1998) (requiring "a voluntary or intentional relinquishment" of setoff for waiver); see also Chassen v. United States, 207 F.2d 83, 84 n.3 (2d Cir. 1953). Other courts have said that a party may waive setoff rights by failing to assert them in a timely fashion. United States v. Cont'l Airlines (In re Cont'l Airlines), 134 F.3d 536, 541 (3d Cir. 1998) ("We recognize that a right of setoff is preserved under § 553 in a bankruptcy proceeding but we believe that the right must be exercised by the creditor in

-24-

timely fashion and appropriately asserted in accordance with other provisions of the Bankruptcy Code."). These cases are in tension, as a party's delay in asserting its right of setoff will in some cases be unintentional.

The present case requires no general theory of setoff waiver. We do, however, recognize the following principles. First, a creditor in bankruptcy proceedings may expressly waive a right of setoff -- as, for example, by a written statement that the creditor will not assert that right. 5 Collier, supra, ¶ 553.07, at 553-78 & n.2 (15th ed. 2001) (citing Blanton v. Prudential-Bache Securities, Inc. (In re Blanton), 105 B.R. 321, 335 (Bankr. E.D. Va. 1989)); see also In re Metro. Int'l, Inc., 616 F.2d 83, 86 (3d Cir. 1980) (holding that a creditor had expressly waived its right as a matter of law by oral statements on the record). Second, a court may imply a waiver of a right of setoff from the creditor's conduct. Hoffman v. Gleason (In re Capital Nat'l Bank of Lansing), 107 F.2d 101, 104 (6th Cir. 1940) (citing Cumberland Glass, 237 U.S. at 459). That conduct, however, must fairly demonstrate the creditor's intent. For example, the voluntary payment by the creditor of its debt to the debtor, without any reservation of a right of setoff, waives that right. In re Mauch Chunk Brewing Co., 131 F.2d 48 (3d Cir. 1942) (so holding with regard to a bank's payment of an account to a trustee in bankruptcy). This circuit has held that payment in obedience to a court's judgment, which is not voluntary, is therefore not waiver, even though the creditor had the opportunity to seek a stay of the judgment and chose not to

-25-

do so.  Pub. Serv. Co. of N.H. v. N.H. Elec. Coop., Inc., 884 F.2d 11, 13 (1st Cir. 1989).  Other courts have held that inadvertent payment due to an administrative error also does not waive the right.  McCarty, 158 F.3d at 1001 (so holding and collecting cases).  Third, a waiver of setoff rights, whether express or implied, is not necessarily irrevocable; instead, the creditor may generally rescind the waiver.  When, however, another party to the proceedings has relied on the waiver to its detriment, the court may invoke estoppel and rule that the waiver has become irrevocable.  See Metro. Int'l, 616 F.2d at 86; Chassen, 207 F.2d at 83.[7]  It is not clear whether the waiver could apply even in such a case to a creditor's claims that accrued after the attempted recission.

Our holding that a waiver of setoff implied from the conduct of the creditor must rest on conduct that demonstrates intent will seldom, if ever, permit the courts of this circuit to imply waiver from mere silence.  This result is consistent with the Bankruptcy Code, which provides that with limited exceptions the

---

[7]      Here the rule may differ for the government.  The Supreme Court has held that courts may rarely, if ever, apply the doctrine of equitable estoppel against the government -- and never to require the government to pay public funds contrary to a statutory appropriation.  Office of Pers. Mgmt. v. Richmond, 496 U.S. 414, 419-24 (1990).  This circuit has held that, in the context of procedural requirements in a bankruptcy proceeding, Richmond does not permit estoppel against the government except possibly after government agents commit affirmative misconduct.  Noonan v. Sec'y of Health & Human Servs. (In re Ludlow Hosp. Soc'y, Inc.), 124 F.3d 22, 25-26 (1st Cir. 1997).  The government has not argued to us any theory based on Richmond, Noonan, or similar cases, and so we do not base our holding on them.  If and when a court finally resolves the government's claim against Fleet, however, it should consider the question.

Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case." 11 U.S.C. § 553(a) (2000). Those exceptions include the automatic stay, so that a creditor may not exercise a prepetition right of setoff during bankruptcy proceedings without first obtaining the permission of the court. See id. § 362(a)(7). Nevertheless, there is authority that § 553 may allow a creditor even to wait out the bankruptcy proceedings and then, afterwards, exercise a prepetition right of setoff unimpaired by the actions of the bankruptcy court, although the court has meanwhile granted a discharge or confirmed a plan of reorganization. Davidovich v. Welton (In re Davidovich), 901 F.2d 1533, 1539 (10th Cir. 1990) ("[T]he right to assert a setoff against a mutual, prepetition debt owed the bankrupt estate survives even the Bankruptcy Court's discharge of the bankrupt's debts."); see also Citizens Bank of Md. v. Strumpf, 516 U.S. 16, 21 n.* (1995) (declining to answer the question whether that right survives the confirmation of a plan of reorganization in a Chapter 13 case).

Whether that is so we need not decide today, nor whether to treat waiver of postpetition rights of setoff any differently. That the question is even in issue indicates that the Code grants considerable protection to setoff rights even though the creditors holding those rights remain inactive in the bankruptcy proceeding. Thus, as a general matter, a creditor's silence in the early stages

of bankruptcy proceedings, such as the filing of a proof of claim, does not waive the right of setoff. On the facts of a specific case, however, silence at a specific time may be unequivocally inconsistent with the assertion of the setoff right. We address the conclusion of the bankruptcy and district courts that this is such a case below.

We consider the bankruptcy court's four grounds of waiver in this light.

1. Failure to object to the borrowing order

The bankruptcy court held that the government had waived its right of setoff by "failing to object to the numerous requests for orders authorizing the Debtor to borrow from the Bank against its accounts receivable, including those due from the United States, on a secured and superpriority basis." Calore Express, 199 B.R. at 432. We disagree. If the orders authorizing the borrowing had set a date by which to assert setoff, the government's failure to object to the June 28, 1995, order, or to the orders and stipulations that followed, could conceivably have been inconsistent with an intent to assert any existing right of setoff. The orders did not do so; instead, they granted certain security interests and priority rights to Fleet. Even if those new rights were senior to the government's right of setoff, the orders would not have eliminated the right of setoff itself. They would merely have rendered that right junior to Fleet's new rights. We discuss below the bankruptcy court's conclusion as to seniority of interests. Regardless, the government's acquiescence in the order

-28-

without objection did not waive its right of setoff.

2. Failure to object to Fleet's June 13 motion

The bankruptcy court held that the government had waived its right of setoff by "failing to object to the Bank's Lift Stay Motion in which the Bank expressly stated its intention to liquidate its collateral, including the accounts receivable." Id. This ground apparently encompasses the silence of counsel for the IRS at the June 17 hearing as well as the absence of written filings. As a matter of logic, waiver does not follow from this silence for the same reason that it does not follow from the government's acquiescence in the borrowing orders: lifting the order as to Fleet affected Fleet's rights against Calore, but had no effect on Fleet's or Calore's rights against the government, and therefore acquiescence in the lifting was not inconsistent with the government's intention to assert its setoff rights.

To treat the bankruptcy court's opinion fairly, however, we take a broader view of the significance of the court's actions at the June 17 hearing. By granting Fleet permission to sell Calore's assets, while at the same time postponing the requests of all other creditors, the court intended to allow Fleet to sell the assets as a group and therefore to preserve Calore's value as a going concern. In effect, the court was allowing Fleet to pursue a course of action quite similar to the earlier motion for a sale of assets under 11 U.S.C. § 363, which the court had denied on June 10 primarily because of its effect on the government's rights. From the court's perspective, it had scrupulously protected the

-29-

government's rights on June 10, despite the accusations of Fleet and other creditors at the time that the government's position was unreasonable. A mere week later, the government felt once more that its rights were threatened; but counsel, rather than raising a setoff argument to the court, sat by in silence and allowed events he had already set in motion to frustrate the purpose, if not the literal language, of the court's order. It may be, as counsel said in a later affidavit to the court, that he did not know for sure that the GSA still owed Calore money and so that a substantial setoff remained possible. Even so, he had an inkling that this might be so, and should have shown greater candor.

The subsequent history of this case has shown that counsel's silence, whether or not it was waiver or inequitable conduct, was certainly unwise. We discourage similar conduct by bankruptcy litigants, including the government, in the future. Nevertheless, the question whether silence constitutes waiver requires an inquiry, as we have discussed above, on all the facts of the case. See 5 Collier, supra, ¶ 553.07[2]. It is unsuitable for resolution in a nonevidentiary hearing. The concerns raised by the bankruptcy court, although significant, did not give it sufficient grounds to conclude as a matter of law that the government had so clearly waived its right of setoff as to lack even a colorable claim. Therefore, counsel's silence at the June 17 hearing does not support the bankruptcy court's finding of waiver. If and when a court more fully develops the facts of this case, our holding today will not preclude Fleet from arguing that

on those facts the government's silence amounted to waiver.

3.  Statements made in proofs of claim

The bankruptcy court held that the government had waived its right of setoff by "expressly stating in its Second Proof of Claim dated January 25, 1996 and the attachment that its claim for prepetition taxes was not subject to setoff." Calore Express, 199 B.R. at 432.  This reasoning can apply, of course, only to the IRS's prepetition claims, which are the only ones described in the January 25 proof of claim.  We agree that as to these claims the government's filing contained a waiver (which may later have been rescinded, as discussed below).  The proof of claim itself stated that "[i]n filing this claim, claimant has deducted all amounts that claimant owes to debtor"; the attachment to the proof stated that "[t]his claim is not subject to any setoff or counterclaim." The government argues that this should be discounted as preprinted form language, an argument we consider irrelevant.  The IRS, of all litigants, can hardly complain to the courts when it errs in filling out a form.

The government also points out that the language of the form contemplates that a creditor will exercise setoff rights before even filing a proof of claim.  That language seems inconsistent with 11 U.S.C. § 362(a)(7), which subjects prepetition rights of setoff to the automatic stay.  It also seems inconsistent with the broader policy of the Bankruptcy Code regarding setoff, which is -- particularly in Chapter 11 reorganization cases -- to encourage creditors to forbear at least temporarily from exercising

setoff rights that, if exercised, would put debtors immediately out of business. See Pub. Serv. Co., 884 F.2d at 13 ("To implement the congressional purpose, courts should attempt to minimize the dislocations attendant to setoffs."). Nonetheless, the IRS could have easily fixed any inconsistency by striking the offending language or attaching an explanation, as the GSA did to its February 1 proof of claim.

Stronger, and possibly correct, is the government's argument that it sufficiently preserved its rights as to the setoff of the GSA's debt against Calore's overcharges by asserting them in the GSA's February 1 proof of claim, and as to the setoff of the GSA's debt against Calore's tax debt by asserting them in the government's April 1 objection to Calore's third amended reorganization plan. As to the February 1 proof of claim, this is unquestionably correct, as no prior statement of waiver applies to the GSA's claim for overcharges. That claim, however, amounts to only $6,734.24. As to the April 1 objection to Calore's plan, it stated: "The Bankruptcy Code specifically preserves the United States' right to offset any pre-petition claims of the United States against any pre-petition claims of the Debtor." That statement expresses the Government's intent, as of April 1, to assert its setoff rights on its prepetition claims -- that is, it rescinds any prior waiver of setoff. See Chassen, 207 F.2d at 83 (holding that a clarification by the government was "the equivalent

of an amendment of [the government's] proof of claim").[8]

That recission came too late, however, if Fleet had in fact previously relied to its detriment on the IRS's waiver of January 25. The bankruptcy court stated that Fleet's continued lending to Calore demonstrated both reliance and detriment, a statement that suggests the application of estoppel, although the court did not use that term. Fleet reasserts this theory on appeal. The government responds that: first, it is not clear when Fleet learned of the statement on the government's proof of claim, as shown by a statement by Fleet's counsel that he did not "review proofs of claim . . . at that stage in the case"; second, Fleet's actual lending exposure was approximately the same in August 1996 as it had been in May 1995, so that it is unclear that Fleet took any knowledge about the government's intent as to setoff into consideration; third, no deadline for the filing and amendment of claims had passed before April 1, which appears to amount to an argument that Fleet could not have reasonably relied on the original waiver. Whether Fleet actually relied on the government's waiver is a question of fact that the parties dispute, and cannot be determined purely from the record. See Metro. Int'l, 616 F.2d at 86-87 (holding that the undisputed facts of that case established waiver but remanding for a hearing to establish the question of detrimental reliance). On the facts of this case, the

---

[8]    The bankruptcy court commented in its opinion that the language in the April 1 objection was too general. Calore Express, 199 B.R. at 433. We see no difficulty in the use of a general statement to rescind a general waiver such as the one contained in the January 25 proof of claim.

government's possibly-rescinded waiver therefore did not deprive the government of a colorable claim based on its right of setoff, and does not support the bankruptcy court's finding of waiver as a matter of law.

4. Silence in requests for payment

The bankruptcy court held that the government had waived its right of setoff by "failing to assert a right to setoff in any of its Requests for Payment of Postpetition Taxes." Calore Express, 199 B.R. at 432. We disagree. Unlike the third finding of waiver, which was based on definite statements in the IRS's proofs of claim, this finding relies simply on the government's failure to mention setoff in its various requests for payment, when there was no rule or court order requiring it to do so. As our discussion above makes clear, that silence is insufficient to support a conclusion of waiver as a matter of law.

5. Summary

For the reasons we have discussed, only two possible grounds of waiver survive our decision in this appeal. One is the statement in the IRS's January 25 proof of claim, which is a clear waiver but which applies only to prepetition claims and which in any event the government may have properly rescinded on April 1. Whether that recission took effect depends on an inquiry into estoppel, which should take into account all the facts of the case. The other is the government's silence at the June 13 hearing, which may constitute waiver and may potentially apply to either pre- or postpetition claims. That inquiry, too, requires consideration of

-34-

all the facts of the case.[9]

D. <u>Priority of Fleet's lien</u>

The bankruptcy court reasoned that the government's right of setoff was junior to Fleet's lien as a matter of law because that court had authorized on June 28, 1995, and periodically renewed a borrowing order under the three subsections of 11 U.S.C. § 364(c). The order granted a secured lien on all of Calore's pre- and postpetition assets, including accounts receivable, to Fleet's predecessor Shawmut. It also granted priority over all other administrative claims. The district court did not reach this ground of the bankruptcy court's judgment.

Only one of the bankruptcy court's three sources of statutory authority, 11 U.S.C. § 364(c)(2), provides Fleet with a colorable claim to priority. The borrowing order gave Shawmut a senior lien on Calore's previously unencumbered assets under § 364(c)(2). It also gave Shawmut a junior lien on Calore's previously encumbered assets, certain vehicles and equipment, under § 364(c)(3). Because accounts receivable were not in this category, the § 364(c)(3) lien is not relevant here. In case Shawmut's claim turned out to be undersecured by the assets subject to lien, the court gave Shawmut a superpriority administrative claim under § 364(c)(1). That superpriority is also irrelevant here because any unsecured claim, even an administrative one, is

---

[9] As discussed earlier, both inquiries should also take into account the relevance, if any, of the principles set forth in <u>Office of Personnel Management</u> v. <u>Richmond</u>, 496 U.S. 414 (1990), and <u>Noonan</u> v. <u>Secretary of Health and Human Services</u> (<u>In re Ludlow Hospital Society, Inc.</u>), 124 F.3d 22 (1st Cir. 1997).

junior to a secured claim; and the government's setoff claim qualifies as a secured claim under 11 U.S.C. § 506(a). Therefore, Fleet's sole possible argument for priority rests on the § 364(c)(2) lien.

1. Choice of law

The bankruptcy court applied Article Nine of the Uniform Commercial Code to determine the relative priority of Fleet's lien and the government's setoff rights. We initially determine the proper source of law for the priority dispute in this case. As a general matter, 11 U.S.C. § 553 does not create a scheme of priority for the setoff rights it preserves, any more than it creates those rights themselves, see Sisk v. Saugus Bank & Trust Co. (In re Saugus Gen. Hosp., Inc.), 698 F.2d 42, 44 (1st Cir. 1983). Setoff is a creature of the common law, and therefore in most cases a question of state law under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938). Federal law, however, determines the rights and liabilities of the United States, as the Supreme Court held in Clearfield Trust Co. v. United States, 318 U.S. 363 (1943). If Congress enacts a statute, that statute governs. If Congress does not, the federal courts apply federal common law. The United States's general right of setoff, like its other rights in commercial disputes, is a matter of federal common law, as is the priority of that right as against the rights of other creditors.

We address first, if briefly, the government's contention that this case falls within a federal statute. The government invokes the Assignment of Claims Act, 31 U.S.C. § 3727 (1994),

which provides certain requirements for the assignment of claims against the federal government, none of which Fleet has met. Fleet responds correctly that the Act applies only to the voluntary assignment of claims, and not to assignments by operation of law, including those in the context of bankruptcy. United States v. Aetna Cas. & Sur. Co., 338 U.S. 366, 373-74 (1949). The government also makes some passing references to the Judgment Setoff Act, 31 U.S.C. § 3728 (1994 & Supp. II 1996), but does not press the point; there is no judgment at stake in this case and so the Act by its terms does not apply. Therefore, the question of the priority of the government's setoff rights is a question of federal common law.

That said, a federal court applying federal common law will often simply incorporate the law of the appropriate state if there is no relevant federal interest to justify a distinct federal rule. In United States v. Kimbell Foods, Inc., 440 U.S. 715 (1979), the Supreme Court considered whether to rely on any federal interest in generating federal common law to determine the priority of a lien that the government acquired as a party to a contract. The Court held that state law should apply, and reasoned that there was no sufficiently compelling federal interest at stake. Id. at 740. It noted that the expectations of parties to commercial transactions tend to be based on state law, and that the federal courts should not disrupt those expectations without good reason. Id. at 739-40. The Court distinguished the problem of commercial liens held by the federal government from that of federal tax liens. Tax collection is uniquely important to the proper

-37-

functioning of the government, and in tax cases the government is an involuntary creditor.  Id. at 734-36.

The present case involves both of the situations the Court discussed in Kimbell Foods.  As to Calore's unpaid taxes, the government is an involuntary creditor facing the problem of enforcement: if the government's allegations are true, Calore was engaged in a continuing process of misappropriating funds supposedly held in trust for employee taxes both before and after filing its Chapter 11 petition.  As to the GSA's contract debts, by contrast, the government was purchasing services on the market and should not necessarily expect treatment different from that of any other participant in commerce.

When the federal courts make new federal common law, it is to protect strong federal interests -- for example, the interest of the government as tax creditor.  Happily for federalism purposes, state law adequately protects that interest here.  We read the Uniform Commercial Code, at least as interpreted by Massachusetts,[10] differently than did the bankruptcy court, and for present purposes we incorporate state law into federal.[11]  Our analysis of the Code follows.

---

[10]    The bankruptcy court applied the law of Massachusetts to this case, and the parties do not dispute that Massachusetts's law applies, although they do dispute its content.

[11]    On July 1, 2001, Revised Article Nine of the Uniform Commercial Code took effect in Massachusetts, as in all fifty states.  See 2001 Mass. Acts 26.  Our discussion of the law, of course, applies the law as it was in effect at the time the events took place.

2.  Article Nine and setoff priority

Initially, we note that the bankruptcy court correctly concluded that Article Nine of the Uniform Commercial Code applied to the relative priority of setoffs and security interests despite the language of section 9-104(i), which states that the Article does not apply to "any right of set-off." Mass. Gen. Laws ch. 106, § 9-104(i) (2000) (repealed 2001); see 5 Collier, supra, ¶ 533.12[1] ("The majority of jurisdictions construe section 9-104(i) to mean that, although a creditor may claim and enforce a right of setoff without complying with the requirements of Article Nine, nevertheless Article Nine governs the priority of any setoff right in conflict with an Article Nine security interest."). The Supreme Judicial Court of Massachusetts has applied Article Nine to determine the validity of a setoff right after an assignment of accounts receivable as security. See Graves Equip., Inc. v. M. DeMatteo Constr. Co., 397 Mass. 110, 489 N.E.2d 1010, 1011 (1986); Fall River Trust Co. v. B.G. Browdy, Inc., 346 Mass. 614, 195 N.E.2d 63, 64 (1964).

The bankruptcy court then proceeded to apply section 9-312(5) of that Article. Section 9-312(5) accords priority "between conflicting security interests in the same collateral" to that secured party who first files or perfects according to the requirements of Article Nine; or, if neither of the contesting parties has filed or perfected, to that party whose interest first attached.[12] Fleet defends the bankruptcy court's choice of that

---

[12]  The relevant part of section 9-312 reads:

provision. The government argues that, instead, the court should have applied section 9-318, which applies to the assignment of accounts receivable. Under section 9-318, an account debtor may assert against an assignee any "defense or claim" that either arises from the terms of the assigned contract or accrued before the account debtor had notice of the assignment.[13]

For three reasons, we hold that section 9-318 applies to this case and section 9-312(5) does not. First, the government's right of setoff fits within subsection 9-318(1)(b)'s description of "a defense or claim of the account debtor against the assignor." In two cases we cited earlier, Graves Equipment and Fall River Trust, Massachusetts's highest court applied section 9-318 to a right of setoff asserted by an account debtor against an assignee of accounts receivable. Graves Equip., 489 N.E.2d at 1011-12; Fall

---

(5) In all cases not governed by other rules stated in this section . . . priority between conflicting security interests in the same collateral shall be determined according to the following rules:
    (a) Conflicting security interests rank according to priority in time of filing or perfection. . . .
    (b) So long as conflicting security interests are unperfected, the first to attach has priority.

Mass. Gen. Laws ch. 106, § 9-312 (2000) (repealed 2001).

[13] The relevant part of section 9-318 reads:

(1) . . . [T]he rights of an assignee are subject to
    (a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and
    (b) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.

Mass. Gen. Laws ch. 106, § 9-318 (2000) (repealed 2001).

-40-

River, 195 N.E.2d at 64. The only possible way to distinguish this case from Graves Equipment and Fall River Trust would rely on the fact that in this case, Fleet's predecessor Shawmut first took a lien on Calore's accounts, by a prepetition security agreement and then by the June 1995 borrowing order; only later, with the July 1996 sale of assets, did Fleet obtain permission to lift the automatic stay and to exercise its right to take an assignment of the accounts. The application of section 9-312(5) must therefore rest on the premise that in this context the rights of a creditor who holds a perfected lien on accounts receivable and subsequently becomes an assignee exceed those of one who becomes an assignee directly.

Neither Fleet nor the bankruptcy court, however, offer any reason grounded in policy to reach a different result in this case, which features an assignment through a lien, from that we would reach in a case of a direct assignment. It would be an odd result if parties whose agreement to assign accounts would remain subject to an account debtor's existing defenses and claims could bypass those defenses and claims with the device of a lien. Moreover, there is authority in other jurisdictions to the contrary. See Me. Farmers Exch. v. Farm Credit of Me., 2002 ME 18, ¶ 13 (stating that section 9-318 "provides a limited right to a setoff for [an account debtor], a right that can be superior to the security interest of a secured party," and then applying section 9-318(1)(a) because the account debtor had notice); Commerce Bank, N.A. v. Chrysler Realty Corp., 244 F.3d 777, 783 (10th Cir. 2001)

-41-

(applying Kansas law) ("The fact that [the secured party] had a perfected security interest, and [the account debtor] did not, makes no difference because [the secured party]'s secured status comes into play only after it is shown that [the assignor] was entitled to payment of the funds."); see also Chase Manhattan Bank (N.A.) v. State, 357 N.E.2d 366, 369 (N.Y. 1976) ("[T]he 'first to file' rule [referring to section 9-312(5)], designed to resolve situations where secured parties are competing in asserting superior rights, should not be controlling when the dispute is between a secured party and an account debtor."). In addition, in United California Bank v. Eastern Mountain Sports, Inc., 546 F. Supp. 945 (D. Mass. 1982), cited in Graves Equipment, 489 N.E.2d at 1012, a case decided under Massachusetts law, the District of Massachusetts applied section 9-318 to an assignment following the conveyance of a security interest. Id. at 950, 963-64.

Fleet relies for its contrary argument on MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc., 882 F.2d 615 (2d Cir. 1989), in which the Second Circuit applied section 9-312 to a dispute between an account debtor and the assignee of accounts receivable. Id. at 620. In that case, however, the account debtor did not actually own the claim against the assignor that it sought to assert against the assignee, and the court stated that New York law left open the question what would occur if the account debtor did own the asserted claim. Id. In this case, Fleet cannot argue

that the government does not own the IRS's claim against Calore.[14]

Second, the government's right of setoff is not clearly a "security interest" within the meaning of section 9-312(5). Although a claim accompanied by a right of setoff is a "secured claim" within the meaning of the Bankruptcy Code, 11 U.S.C. § 506(a), a secured claim within the meaning of federal bankruptcy law is not necessarily the same thing as a security interest within the meaning of Article Nine. If a right of setoff were an Article Nine security interest, it is difficult to see how it would escape the procedural requirements for priority, such as filing or perfection, imposed by that Article. That result would produce tension with the reading of section 9-104(i) discussed above, under which setoffs are not subject to Article Nine's procedural requirements. Some courts have found persuasive in this context a comment of Article Nine's reporter, Professor Grant Gilmore, that "[o]f course a right of set-off is not a security interest and has never been confused with one: the statute [referring to section 9-104(i)] might as appropriately exclude fan dancing." I G. Gilmore, Security Interests in Personal Property § 10.7, at 315-16 (1965), quoted in Nat'l City Bank, N.W. v. Columbian Mut. Life Ins. Co., 282 F.3d 407, 410 (6th Cir. 2002).

---

[14]    Fleet might have made, but did not make, the somewhat analogous argument that a claim of the IRS and a debt of the GSA are not mutual for the purpose of setoff. The bankruptcy court raised but did not answer that question. Calore Express, 199 B.R. at 432 & n.7. As we lack the benefit of decisions by either the bankruptcy court or the district court, and as the parties have not briefed the issue, we also decline to answer that question today. It will remain for any further proceedings brought by the government.

Third, section 9-312(5) by its terms applies "[i]n all cases not governed by other rules stated in this section," that is, section 9-312. The first subsection of that section, 9-312(1), in turn states that "[t]he rules of priority stated in other sections of this Part and in the following sections shall govern when applicable." The Part cited is Part Three of Article Nine, which includes section 9-318. This language indicates that section 9-312(5) states a default rule that courts should apply only in the absence of other governing provisions. Thus, to the extent we could properly view the dispute between Fleet and the government as either a contest "of priority between conflicting security interests" or a question of the validity of a "defense or claim of the account debtor against the assignor," we should adopt the latter perspective.

Accordingly, we next apply section 9-318 to the facts of this case.

3. Timing of notice and accrual

In this case, because Calore's debt to the IRS was unrelated to the terms of the contract between Calore and the GSA, subsection (1)(b) of section 9-318 governs the outcome. Under that provision, the crucial times are when the government received notice of the assignment of Calore's debts to Fleet, and when the IRS's claim against Calore accrued.

The parties contest exactly when the government received notice. The government argues that it received notice only when Fleet informed the court and the other parties of the sale of

-44-

Calore's assets in August 1996. Because that date is also when Calore ceased doing business as Calore, the government's tax claims necessarily accrued before notice, and those claims take priority. Fleet argues that the government received notice at the time of the first borrowing order, in June 1995, which gave Fleet's predecessor Shawmut its security interest in all of Calore's assets.

The government's claims based on Calore's prepetition tax debts accrued, by definition, before Calore's Chapter 11 petition and so before the borrowing order. The government's rights based on those claims therefore take priority over Fleet's security interest even on Fleet's view of timing. The government's setoff rights based on postpetition tax claims presumably accrued, at least in part, after June 1995 but before August 1996. We must therefore decide whether the borrowing order provided the government with reasonable notice under section 9-318, so that the government cannot now assert claims accruing after the borrowing order against Fleet.

It did not. The borrowing order at most informed the government not of an assignment of Calore's accounts, but only of a lien placed on those accounts that could later lead to an assignment. Following the borrowing order, the government and other acccount debtors continued to do business with and make payments to Calore, and not to Shawmut, the lienholder. At least one court has reasoned in applying section 9-318 that notice of an assignment that precedes the assignment itself is ineffective. See Citizens State Bank of Corrigan v. J.M. Jackson Corp., 537 S.W.2d

120, 121 (Tex. Civ. App. 1976) ("[An account debtor can]not be put on notice of an assignment prior to the time that that assignment existed."). This is not a case in which Calore assigned accounts receivable to serve as security, with the assignment effective at the time the debt was incurred, although such assignments do occur and are sometimes called "security interests." In this case, Fleet acquired its right to collect Calore's receivables only later, after the July 1996 sale of assets.

We need not rule out the possibility that some particularly comprehensive and express form of notice could potentially affect an account debtor's rights before an actual assignment, however. On the facts of this case, the borrowing order lacked sufficient detail to satisfy the requirements of section 9-318(3), which states that notice must "reasonably identify the rights assigned." Mass. Gen. Laws ch. 106, § 9-318(3) (2000) (repealed 2001). As quoted earlier, the borrowing order refers generally to all of Calore's accounts. It does not identify any debtors, contracts, or amounts. Although there are no relevant cases under Massachusetts law, courts applying section 9-318(3) as part of the law of other states have required more detail in notices of assignment. See Progressive Design, Inc. v. Olson Bros. Mfg. Co., 263 N.W.2d 465, 468-69 (Neb. 1978) (rejecting as reasonable notice a letter that "did not identify the contract by date, or by the type or kind of contract, nor did it refer to the product or services contracted for, nor even the amount of money involved"); Bank of Salt Lake v. Corp. of the President of the

<u>Church of Jesus Christ of Latter-Day Saints</u>, 534 P.2d 887, 891 (Utah 1975) (dictum) (stating that a letter with incorrect invoice numbers and amounts did not provide reasonable notice). Certainly, in order to prevent an account debtor from raising against an assignee defenses and claims accruing after the notice but before the assignment itself, the notice given would have to meet at least the standards set forth in these cases.

The reason that the order did not include such specifics is probably that no one involved -- Fleet, Calore, or the bankruptcy court -- intended the order to serve as notice to Calore's account debtors of an assignment of Calore's accounts receivable. Nor would the attorneys at the U.S. Attorney's Office for the District of Massachusetts, to whom the order was served, have had any reason to think that the order had such a purpose. Nothing in the order even mentioned the IRS or the GSA, whose agents might perhaps have understood the potential significance of a potential assignment. <u>Cf.</u> <u>Chase Manhattan Bank</u>, 357 N.E.2d at 369 (holding that a UCC filing statement filed with New York's Secretary of State did not give reasonable notice to the state of its contents under section 9-318). Accordingly, the government received its notice of assignment no earlier than the following August; because the government's tax claims accrued prior to that date, it can exercise its right of setoff against Fleet, and the bankruptcy court's conclusion was mistaken.

The purpose of the rule requiring notice to foreclose an account debtor's setoff rights for claims independent of the

contract out of which the account arises is presumably to permit the account debtor to protect its rights. Knowing that it will no longer be able to rely on the assigned accounts in disputes with the assignor, the account debtor may act differently in dealings with the assignor, or even cease doing business with the assignor entirely. The government in this context is, of course, unable to make such choices. Calore's tax debts would continue to accrue regardless of the government's actions. That distinction between the government and an ordinary commercial actor is one of the reasons that the federal courts have been particularly careful to guard the government's interest in tax collection. See Kimbell Foods, 440 U.S. at 735-36 ("The United States is an involuntary creditor of delinquent taxpayers, unable to control the factors that make tax collection likely."). Nevertheless, proper notice in this case might have been helpful to the United States: specifically, it might have alerted government attorneys to the need to act quickly to protect the government's rights. Thus, while we have treated the waiver and priority questions separately in this opinion, the underlying theme remains that it is not clear on the present record that the government's inaction was unreasonable or inappropriate.

## IV.

On the present record, the bankruptcy court's decision can stand on none of the grounds it gave: waiver, equitable discretion over setoff, and priority are all insufficient. As the government points out, the remaining dispute no longer concerns an

-48-

existing bankruptcy estate; neither party has briefed where any future proceedings, if any, should take place. We therefore reverse the decision of the district court and remand with instructions to reverse the decision of the bankruptcy court, and to determine, with the assistance of the parties, the appropriate disposition of the case. Should the government bring future proceedings against Fleet for restitution, this opinion will provide guidance for that action. No costs are awarded.